**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William ALLRED, Antoine Haddad,**
**Lou Milhous, Soren Hansen, and**
**Donallco, Inc., Defendants–Appellants.**

No. 87–5625.

United States Court of Appeals,
Fifth Circuit.

March 2, 1989.

Shirley Baccus–Lobel, Dallas, Tex., Christopher G. Caldwell, Los Angeles, Cal., for Allred, Haddad, Millhouse, Hansen & Donallco, Inc.

W. Ray Jahn, LeRoy Jahn, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, JOHNSON, and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

Appellants William Allred, Antoine Haddad, Lou Milhous, Soren Hansen, Donallco, Inc. and six other Donallco owners, officers or employees[1] were charged with conspiring to defraud the United States in violation of 18 U.S.C. § 371.[2] Counts Two through Five charged Allred, Haddad and

---

1. Appellants are a corporation, Donallco, Inc., and four of its officers, owners, or employees including Allred, the president and primary stockholder; Haddad, the product manager on the aircraft parts involved in the instant case; Hansen, head of the machine shop and a member of the quality review committee; and Milhous, head of the engineering department and a member of the quality review committee.

Formal proceedings commenced in January of 1987 when Allred, Haddad and Donallco were charged in a fifteen-count indictment with mail fraud and false statement violations in violation of 18 U.S.C. §§ 1341 and 1001 respectively. Teresa Allred and Joe Kehoe were also charged, Kehoe on all counts and Teresa Allred on two counts. A superceding indictment filed in May of 1987 charged all of the appellants in a sixteen-count indictment. This indictment charged a conspiracy to defraud the United States in addition to the substantive violations charged in the original indictment. Teresa Allred, Ted Allred, Arthur Meekings, John Stegura, Curt Bardeaux, and Emmet Shultz were

also charged. Joe Kehoe was not charged. A second superceding indictment, on which appellants were brought to trial, was returned July 29, 1987.

Following a trial which commenced on August 4, 1987, a jury in the United States District Court for the Western District of Texas at San Antonio returned its verdict. As to the indictees not included in this appeal, Shultz entered a plea of guilty prior to trial, and the remainder of the defendants were granted judgments of acquittal at the conclusion of the Government's case in chief.

2. Specifically, Count One charged that the defendants conspired to defraud the United States of its right "to honest and faithful performance of government supply contracts free from trickery, deceit and fraud, and by obtaining purchase orders and contracts from the United States of America by means of false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 371."

Donallco with making false or fraudulent statements to an agency of the United States (the Air Force) in connection with contracts for surplus aircraft parts in violation of 18 U.S.C. § 1001.[3] The case was tried before a jury.

Of the appellants, Allred was convicted on the conspiracy to defraud count and on three of the false statement counts. Haddad was convicted on all five counts. Milhous and Hansen were convicted only on the conspiracy count. Donallco, Inc. was convicted on all five counts.

Appellants, in a timely appeal to this Court, raise numerous issues. Having determined that no grounds for reversal have been demonstrated, we affirm.

## I. *FACTS AND PROCEDURAL HISTORY*

Donallco, Inc. (hereinafter Donallco) is a California corporation which engaged in the manufacture of aircraft parts for sale to military and commercial customers. Additionally, Donallco bought and sold surplus aircraft parts and was a certified F.A.A. overhaul facility. One of Donallco's most lucrative products was a Pesco fuel pump. The Pesco pumps were originally manufactured by Pesco, a division of Borg-Warner; Pesco continued to manufacture these parts until the 1972 sale of the Borg-Warner division of General Motors to Sundstrand Corporation. Around the time of the sale to Sundstrand, Emmett Shultz (a co-indictee) retired from Pesco and ob-

tained employment at Donallco. In 1974, Donallco and Sundstrand entered into an agreement permitting Donallco to manufacture a limited number of Pesco pumps and replacement parts for these pumps. The agreement included the older model Pesco pumps such as those used on DC–3 aircraft; however, the agreement did not allow Donallco to manufacture the main fuel pump for the C–130 aircraft.

The crux of this case centers around Donallco's bid and sale to Kelly Air Force Base (hereinafter Kelly) of component parts used in the fuel pump on the C–130 aircraft. Donallco, representing to Kelly that the parts were new, unused surplus, identified the parts as former government-owned material originally manufactured by Pesco. Donallco, in fact, had manufactured the[i] parts. This misrepresentation forms the basis of the four false statement counts and the basis of the conspiracy to defraud count. The alleged objective of the conspiracy was to misrepresent the history and the condition of the parts in order to bypass the Government's inspection and approval system.[4] The facts set forth in this opinion are either undisputed in the parties' briefs or were testified to at trial.

### A. Donallco's Receipt of Blueprints for Unlicensed Parts

The parts specifically involved in this case include part number 0212310, the drive shaft for the main fuel pump on the C–130, and part number 0212312, the cou-

3. Counts Two through Five, which charged the substantive false statement violations, relate specifically to certain Donallco bids which correspond to the four orders which constitute the specific subject matter of the indictment. These four orders are labelled SA53, SA58, SA70, and SA40.

4. The Military Inspection Standard 4208 (hereinafter MIL–I) allows Department of Defense Quality Assurance Representatives to inspect the actual process of producing parts. Under this standard, the inspector is informed in advance of when a production run is to occur. The inspector is given the opportunity to review the documents which indicate that the product is being manufactured in accordance with a blueprint approved by the Air Force. This assures that the correct raw material is being utilized, that all in-house procedures are appropriately conducted, and that all off-premises procedures are properly carried out. The inspector is also

given the opportunity to review in-house inspection records, and to approve the decisions of the company's quality assurance inspectors. In sum, the Government is very much involved in the manufacture of any part produced pursuant to the MIL–I standard.

When the Government acquires surplus parts, a lesser inspection standard is utilized. In the instant case, the officer in charge of acquisitions believed that the government surplus had already surpassed the MIL–I hurdle at the production phase. Therefore Donallco was only required to submit a small number of samples. The parts were physically examined for rust, corrosion, or other physical damage. Additionally, the inspection involved an examination of dimensional conformance to the drawing. Consequently, Donallco was never subjected to the rigorous constraints of the MIL–I standard.

pling which connects the drive shaft to the engine. Donallco was never licensed to engage in the manufacture of these parts; rather, Sundstrand continued to manufacture the parts for the C–130 aircraft because of the economic success of that line of products.

Subsequent to the commencement of the licensing agreement, Shultz, who had retired from Pesco, informed Allred that he was able to obtain blueprints of unlicensed Sundstrand parts; Allred instructed Shultz to obtain the drawings, and to pay the source for any which were clandestinely removed from Sundstrand. Allred, at this point, functioned as both Donallco's president and as the product manager for Pesco parts. Haddad served as Allred's assistant, and later succeeded Allred as product manager. Either Allred or Haddad provided Shultz with part numbers for blueprints to be obtained from Sundstrand. Shultz estimated that he brought over 200 blueprints into Donallco with the aid of his source at Sundstrand.[5]

B. The Establishment of the DE, F, and H Part Numbering System

The trial testimony indicates that Donallco commenced keeping a set of books which cross-referenced the number assigned to the part by the legitimate manufacturer and the part number assigned to the part by Donallco. These internal records were originally referred to as the Donallco Engineering, or "DE," records.[6] A new numbering system was introduced in 1981 which incorporated the letter "F" (for fuel pump) and the letter "H" (for hydraulic pump).[7]

When Donallco commenced the manufacture of a part on which it held a license, the part was manufactured under the number assigned to it by the original manufacturer. Otherwise, the DE, F, or H system was utilized, and the manufacture of the part was carried out surreptitiously.[8] The unlicensed parts left the manufacturing division of Donallco without a part number assigned to them. Although the new manufacturing records reflected that the parts had been placed in the new manufacturing inventory, the parts did not go into that stock. Instead, Haddad would make a notation in Donallco's records indicating that he had checked out the entire production run of the F or H numbered parts. He would then adjust Donallco's records to reflect that the parts carried under Donallco part numbers had been acquired through the purchase of new, unused government surplus material from the Naval Air Station in Norfolk, Virginia, or from a surplus supply company.

Haddad coordinated the movement of the F and H numbered parts through the use of the "red book" which was kept locked in his desk. This log contained the Donallco part number, the nomenclature of the particular part, the number assigned by the legitimate manufacturer, and production information concerning current or future needs for various unlicensed parts.

C. Counts Two Through Five: The Specific Transactions Involved

1. The processing of Government solicitations

Government solicitations from Kelly requesting spare parts for the C–130 aircraft

---

5. The blueprints for the parts on which Donallco held a license to manufacture were stamped with a Sundstrand logo which reflected that they were provided pursuant to a licensing agreement. The blueprints for parts on which Donallco held no license bore a stamp reflecting Sundstrand's proprietary interest in the parts.

6. The Donallco engineering books indicate that Hansen requested that a DE number be assigned to the shafts and couplings involved in this case. The shaft, number 0212310, was assigned number DE–2953 in October of 1973. In May of that year, the coupling, number 0212312, had been assigned part number DE–2802. Appellants Allred, Haddad, Hansen, and

Milhous were among the limited number of people at Donallco who were authorized to request the assignment of a DE part number.

7. Under this system, the coupling and shaft received the designations F 295 and F 391 respectively.

8. For example, whenever visitors, including those from Kelly Air Force Base, toured the plant, the F and H parts were removed from the manufacturing floor at Hansen's direction. Additionally, Milhous instructed the chief machinist to be "quiet" about the F numbered parts, and told him that they were "Bill Allred's project."

arrived at Donallco in one of three forms: a formal request for bids, a synopsis of the request prepared by the Department of Defense, or a request prepared by a private bid service. The procurement of aircraft parts at Kelly is initiated by the item manager within the Directorate of Material Management who forwards a purchase request to the Directorate of Contracting. The purchase request reflects the approved sources of the part. At Donallco, the request for bids was routed to the records section where the quantity of the parts in inventory would be recorded in the margin, along with the most recent prices quoted for the part.

When preparing a checklist for Government bids, Haddad's assistants would initially check the available inventory. If there were no available parts, and the part was one on which Donallco held no license to manufacture, the assistants would report that information to Haddad. Haddad, through his assistants, would refer to the red book to determine if Donallco was currently engaged in the manufacture of that item. If so, Haddad would determine the unit price, the delivery date, and the number to be bid.[9] This information, along with the designation that the part was "new, unused surplus," was entered on the checklist.

The actual bids were prepared and submitted by the contract division based on the information contained in the checklist. The bids identified the parts as being originally manufactured by Pesco, and purchased by Donallco from the Norfolk Naval Air Station in Norfolk, Virginia. Before transmission to Kelly, all bids prepared by Haddad were forwarded to Haddad or Allred for review.[10]

Bids were either mailed or teletyped to the Government buyer at Kelly who forwarded them to the engineer in Material Management. The representation that the parts were manufactured by Pesco was accepted at face value. After determining that surplus parts were an acceptable commodity and setting the applicable inspection standard,[11] the Air Force drafted a purchase order for transmission to Donallco. Donallco, because it was selling "surplus" parts, was not bound by the MIL–I standard. However, the contracts awarded to Sundstrand for the manufacture of the same parts did require conformance to the MILI inspection standard.

## 2. Count Two: Purchase Order SA53

In 1982, the Government initiated a request to purchase eighty-three of the couplings numbered 0212312. The Contracts Directorate at Kelly arranged for a synopsis of the coupling requirement to be published in the Commerce Business Daily, a publication of the Department of Commerce which contains information on anticipated Government purchases so that contractors can tender bids. The Government directly solicited Sundstrand, the only approved source,[12] and received a bid of $187.37 each for the eighty-three couplings. Donallco received information about the Government solicitation through a commercial bid service.

Because only five couplings were in stock, the bid sheet at Donallco was annotated to reflect that amount. Also, the margin of the bid sheet was marked with the designation "PE," indicating that the coupling was a Pesco part on which Donallco held no license. Gary Tabarez, an assistant product manager working under Haddad, prepared the checklist for Government bids, which reflected that eighty-three of the pieces would be supplied at a unit price of $126.[13] The parts were described as new, unused surplus purchased from Norfolk in 1973. Although Donallco had possession of the blueprint for the part, Tabarez indicated otherwise on the

---

**9.** When Haddad was unavailable, the assistants went to Allred.

**10.** Three of the four bids involved here were initialled by Allred.

**11.** See footnote 4 *supra*.

**12.** At the time of the filing of the briefs to this Court, Sundstrand remained the only approved manufacturing source of these parts.

**13.** The delivery date and price were supplied by Haddad.

checklist. Tabarez was trained to complete the checklist in this manner when the part was one which Donallco had no license to manufacture.

Production run number 950400 for 250 pieces of the coupling was initiated in the Donallco machine shop on October 20, 1982. The following day, a teletyped message was sent to Kelly offering to sell eighty-three of the parts which were represented as new, unused surplus originally manufactured by Pesco. Prior to transmittal, the bid was routed to Allred.[14]

After approving acquisition from Donallco, the engineering section at Kelly placed an order for eighty-three of the couplings for a total cost of $10,458. A non-MIL-I inspection standard for surplus material was included in the order. When the order arrived at Donallco, it was coded "PE," to reflect that the order was for an unlicensed part, and "DTH," to indicate that only five of the couplings were in inventory. Contracts, which had a "DTH" code were routed not only to Haddad, but also to Allred.

Although a manufacturing run had been initiated at the time Donallco placed the initial bid, the first eighty-five parts in the lot were not completed until November 27, 1983, because of delays in the manufacturing process. Whenever the Government contacted Donallco requesting an explanation for the delay, Donallco employees, at Haddad's direction, informed the officials that the parts were received from other sources in an unacceptable condition.

During this period, Jerry Layton served as the contract administrator at Donallco. Layton personally responded to some of the Government's inquiries about the delay. According to Layton, after receiving an inquiry, he would approach Haddad, obtain the F part number, and seek out Hansen who was in charge of the machine shop. Hansen would give Layton a delivery date, and Layton would make up an excuse for the failure to deliver with which to pacify the Government inquisitors. Layton testified that he warned both Haddad and Hansen that their actions were fraudulent.

On December 12, 1983, ten initial samples were sent to Kelly to undergo nondestructive testing which consisted of inspecting the samples for corrosion or obvious damage. These parts were approved, and in March of 1984, Donallco shipped the balance of the eighty-three parts to Kelly. The inspection sheet for these shipments indicates that the parts were visually examined for "signs of wear, corrosion, damage, broken or missing parts resulting from storage and mishandling."

### 3. Count Three: Purchase Order SA58

In September of 1983, the item manager for the coupling initiated another purchase request for 153 couplings, part number 0212312, and 120 pieces of its corresponding drive shaft, number 0212310. The request was published in the Commerce Business Daily, and Sundstrand was listed as the only approved source for the parts. Because Donallco had just offered to supply surplus couplings, Donallco was directly solicited to supply surplus material; initially, Donallco responded that it was unable to bid.

At the time the Commerce Business Daily was received at Donallco, the inventory records indicate that two couplings and 218 drive shafts were in stock. On November 8, 1983, a checklist for Government bids was prepared indicating that Donallco would supply 135 of the couplings, eighteen shy of the full amount solicited, and the entire 120 drive shafts. The checklist referred to the parts as new, unused surplus.

A letter bid, representing the status of the parts as new, unused surplus acquired in 1973, was forwarded to Kelly.[15] The bid, found in Donallco's files, was initialled by Allred.

---

**14.** All bids to the Government were routed to Allred prior to transmittal if time permitted. If not, they were routed to him immediately after being sent.

**15.** Donallco bid a per unit price of $105 for the shaft and $126 for the coupling. Sundstrand quoted the Government a price of $150.30 each for the full quantity of couplings and $120.29 each for the shafts.

The engineering department at Kelly approved the acquisition of surplus parts under the lesser inspection system which had been utilized in the earlier purchase order. Because Donallco was unable to supply the full quantity of couplings, a split award was made. The balance of the parts was supplied by Sundstrand subject to the MIL–I inspection standard.

The contract was again coded DTH, indicating that it was routed to Allred. At the time that the contract was received, in February of 1984, production run number 950400 had been completed, but because of the earlier contract on couplings, only 121 of the necessary parts could be furnished from that run. However, in November of 1984, Donallco had initiated production run 950727 to manufacture an additional 150 of the couplings.

The drive shafts supplied to Kelly under this contract came from Donallco's production run number 950231. Donallco's records reflected that the parts were acquired from California Air Supply on February 26, 1982; actually, the parts were manufactured by Donallco under a DE number. After the drive shaft samples had been approved by Kelly, the remainder were sent to the base, along with the 121 couplings, on May 25, 1984.

### 4. Count Four: Purchase Order SA70

On June 2, 1983, an item manager at Kelly generated a request for 154 of the couplings, part number 0212312. Sundstrand, listed as the only approved source of the parts, bid a unit price of $140.24. Donallco was informed of the Government's request through its private bid service and through the notice published in the Commerce Business Daily. The checklist prepared for this bid indicates that Donallco would offer to supply only sixty-eight of the needed couplings at a cost of $126 per unit with delivery in 210 days. The bid was transmitted to Kelly on July 20, 1983. Donallco's file copy of the bid was initialled by Allred.

After surplus procurement was approved, a split award was made, with Donallco receiving a contract for sixty-eight couplings, and Sundstrand receiving a contract for eighty-six. Sundstrand's contract indicated that the parts would be manufactured in accordance with the MIL–I standard. Donallco's contract indicated that the parts would be inspected for corrosion or obvious damage.

Five samples were pulled from Donallco's production run number 950727 which was completed on July 19, 1984. The parts forwarded to Kelly in July were determined to have an inner spline dimension that was out of tolerance. Lieutenant David Jeffcoat, the aeronautical engineer in charge of the C–130 power plant, suggested that Donallco ship the entire lot to Kelly for inspection and that the cost incurred during testing be assessed against Donallco.

In the interim, the five samples were returned to Donallco with no explanation as to the cause of their rejection. Debra Maldonado, an assistant contract administrator at Donallco, made calls to contracting officers at Kelly in an effort to discover why the parts had been returned. Maldonado relayed the information about the defect to Bob Guy, head of Donallco's government contract section. Guy discussed the problem with Haddad, commenting that he was concerned because if all five of the samples were defective, then a bad batch of couplings may have been run at Sundstrand. He told Haddad that Jeffcoat had indicated he might get in touch with Sundstrand and tell them that they may have had a bad production run. Haddad told Guy that he would look into it.

Near January 10, 1985, Guy asked Haddad if Donallco had in fact manufactured the parts. After discovering the true source, Guy attempted to terminate the contract with the Government, but the Air Force refused. Consequently, Guy went to co-indictee Arthur Meekings, then vice president in charge of sales, and informed Meekings that Donallco had in fact manufactured the parts which were being distributed as new, unused surplus. Meekings told Guy he would take care of the problem.

On January 17, 1985, Meekings, Hansen, Haddad and Guy met to discuss the couplings. Hansen informed Guy that the center groove of the coupling had not been cut deeply enough. Although the entire original batch had been lost, the problem had been detected early enough to correct it in the current batch. When Milhous joined the group, he informed the others that the blueprint had been altered to prevent the problem from reoccurring. Guy contacted Lieutenant Jeffcoat and assured Jeffcoat that Donallco would follow up the spline problem and notify the Air Force if there was anything that needed further attention.[16] Following this conversation, Guy expressed concern to Meekings about Donallco's manufacture of parts on which it held no license to manufacture as well as Donallco's representation of the parts as new, unused surplus. Meekings, in response, called Haddad into the office and instructed him to quit manufacturing parts and representing them as new, unused surplus. However, after Meekings left, Haddad explained to Guy that his loyalty ultimately lay with Allred.

During this period, Guy became familiar with the red book which cross-referenced the part numbers assigned by both Donallco and the legitimate manufacturer. Guy had the opportunity to examine the book after Haddad accidentally left the book in Guy's office. Guy had also seen a production calendar in Haddad's office which referred to the F numbered parts which were listed in the book.

Meekings was ultimately relieved of his responsibilities, and Guy resigned his position at Donallco shortly thereafter. At his departure, Guy took the red book with him. He also took the rejected couplings, the coupling blueprint which had been provided to Guy in connection with the measuring of the dimensions of the splines, and other records. The blueprint bore Sundstrand's proprietary stamp.

---

16. After Hansen and Milhous made the appropriate changes on the blueprints and in the manufacturing process, these changes were incorporated into the production process. On April 3, 1985, all 68 of the couplings were delivered to Kelly for dimensional testing.

## 5. *Count Five: Purchase Order SA40*

On March 13, 1985, the item manager at Kelly initiated an urgent request to acquire 520 of the drive shafts, part number 0212310. On June 10, 1985, the Government request was upgraded to emergency. The Donallco offer of 125 of the shafts represented that the parts were new, unused surplus originally manufactured by Pesco.[17] A special certification containing these allegations was prepared. The certificate also represented that Donallco did not have a blueprint of the shaft in its possession. A copy of the bid, which was located in Donallco's files, bore Allred's initials. The request for bids had been reviewed by Haddad.

The engineering section at Kelly approved the acquisition of surplus shafts from Donallco. However, because of the problems with the last acquisition, the engineers required that three samples be submitted for destructive testing. The remainder of the parts were to be checked only for obvious damage. A split award was made, with Donallco supplying 125 parts, and Sundstrand supplying the balance.

On July 2, the Government buyer called and requested a lower price on the drive shafts. Maldonado consulted with Haddad who instructed her to maintain the offered price. Maldonado then obtained Teresa Allred's approval of Haddad's recommendation that the price originally bid remain the same. Teresa Allred, a daughter of appellant Allred and a Donallco stockholder, had become Maldonado's immediate supervisor following Guy's resignation. Teresa Allred sent Maldonado to Joe Kehoe, a vice president of the company who had taken over contract administration.

Kehoe informed the Government buyer that the price was firm, but agreed, at the buyer's request, to an earlier delivery date. Kehoe then approached Haddad, and asked

---

17. On this bid, Donallco specified the MIL–I inspection, although it was inapplicable to surplus, and it was revised to standard inspection by agreement with Kelly.

where the parts were located. Haddad responded that the parts were "[i]n the back; I make them." Record Vol. 43 at 101. He then confirmed that he could deliver 125 of the shafts in thirty days. Maldonado, following Kehoe's instructions, drafted a letter to the buyer agreeing to shorten the delivery date. Maldonado expressed to Teresa Allred her concern over the misrepresentation. She described Donallco's activities as "fraud." The next day, Teresa Allred and Maldonado had a similar conversation with Kehoe; Maldonado resigned shortly thereafter.

Donallco was informed that it had been awarded a contract to supply 125 surplus drive shafts. When this award was received, Maldonado's successor was told to execute Donallco's right to cancel the contract.[18] At Haddad's suggestion, a teletype was sent to the Government claiming that the shafts were received in California from Donallco's warehouse in Oklahoma, but that they were not the correct drive shaft.

### D. The Government Investigation

Prior to Thanksgiving 1985, Special Agent Linda Phillips of the Office of Special Investigations of the Air Force commenced an investigation. By December 24, 1985, the Donallco blueprint for the shaft had been amended by the addition of the notation "same as 0212310." At some point in December, Allred told Shultz of the Air Force's investigation, and stated that they were "in trouble." Shultz suggested removing the blueprints for unlicensed parts from Donallco's files. Allred agreed, and prepared a computer printout of all prints for unlicensed parts which had been obtained.

Shultz used the printout to pull blueprints from the engineering section. The removed blueprints were placed in a box in the trunk of Shultz's car and taken to a commercial storage space. Shultz and Allred each retained a key to the space. A few days after the prints were removed, Allred instructed Shultz to return the prints. They were placed in a locked cabinet in Allred's office. After the prints were hidden, Shultz was called before the federal grand jury and ordered to produce the blueprints. Rather than remove the entire sum of prints, Shultz forwarded approximately seventy of the blueprints he had acquired to the grand jury. Allred instructed Shultz to refile the remaining prints. With Milhous' assistance, this was done on a Saturday morning when no other employees were at the plant.

Prior to sending the prints to the grand jury, Allred called Shultz at home and told him that he was going to change several of the blueprints. The blueprint sent to the grand jury for the coupling, part number 0212312, did not have the stamp on it indicating that it was the property of Sundstrand. The same blueprint, stolen by Guy, bore this stamp.

## II. *DISCUSSION*

Appellants present numerous grounds for reversal of the convictions to this Court. We have considered the entirety of these claims and examined the voluminous record established in this case. Our trevails indicate that no grounds for reversal have been established. Consequently, for the reasons set forth below, we affirm the convictions.

### A. Conviction Based on an Uncharged Offense

Initially, appellants argue that the distinction between the manufacturing of unlicensed aircraft parts and the false bidding of sales to the United States was never adequately explained to the jury. Appellants argue that "from the first day of jury slection [sic] through the Court's instructions of law at the conclusion of trial—the jury erroneously was allowed to believe it could convict Defendants if it found that Defendants had conspired to manufacture unlicensed airplane parts." Appellants' Brief at 28. According to appellants, the structure of the indictment, the evidence presented at trial, and the court's failure to adequately instruct the jury culminated in

---

**18.** The contractor's right to cancel within 15 days is absolute and unqualified.

a conviction for the uncharged offense of conspiracy to manufacture unlicensed aircraft parts.

▰ This broad scale attack on the convictions under Count One does not contain sufficient substance to withstand scrutiny. As their initial support for the allegation, appellants point to a statement by the district court during voir dire. At this early phase of the proceedings, the district court erroneously indicated to the jury that the defendants were charged with a conspiracy to manufacture unlicensed aircraft parts. This misstatement did occur. However, appellants' assertion that this statement was never corrected is in error. When the misstatement was brought to the court's attention, the court attempted to correct the characterization of the charged offense. However, one of the defense counsel interrupted the court's reading of the first and charging paragraph of the indictment, stating "[t]hat satisfies the need at this time." Record Vol. 18 at 81. Having frustrated the court's attempt to clarify the misstatement, defense counsel must shoulder any resulting lack of clarity, and cannot now be heard to complain.[19]

In addition to the reference to the district court's misstatement, appellants also argue that Count One failed to state an offense under 18 U.S.C. § 371 because "as depicted by the evidence at trial, unlicensed manufacturing was the core of Defendants' course of conduct, and any resulting fraud on the government was wholly incidental." Appellants' Brief at 30. As a corollary to this argument, appellants assert that evidence of unlicensed manufacturing was introduced without the necessary linkage to false government bidding.

▰ Appellants correctly conclude that the evidence introduced at trial is indicative of a conspiracy to manufacture unlicensed aircraft parts. However, appellants are incorrect when they state that the fraud on

the Air Force, pertaining to the sale of new parts as surplus, was wholly incidental to the manufacturing and, consequently, unable to support a conviction for fraud pursuant to *United States v. Haga*, 821 F.2d 1036 (5th Cir.1987). In *Haga*, a panel of this Court reversed a conviction under section 371 because of a fatal variance between the charge set out in the indictment and the offense established at trial.

In *Haga*, the appellant was charged with conspiring "to commit offenses against the United States" in violation of 18 U.S.C. § 371. Haga had been hired by two pharmacists, who were operating an illicit enterprise revolving around the black market sale of prescription drugs, to take orders as well as package and mail the goods. After a trial to the bench, Haga appealed on the ground that he was convicted of conspiring to defraud the United States rather than of conspiring to commit offenses against the United States.[20] In reversing the conviction, this Court noted that the language of section 371 provides that it is a crime *"either* to commit any offense against the United States, *or* to defraud the United States."* In a situation where the charging paragraph alleges the former and yet the descriptive paragraphs describe the latter, the conviction must be reversed. In *Haga*, the district court concluded that the defendant engaged in a business involving the secretive and unauthorized sale of prescription drugs resulting in fraud on an agency of the United States, namely the Food and Drug Administration. This Court reversed the conviction, determining that the variance between the indictment and the proven offense was fatal.

Appellants would have us now analogize the situation before us today to that described in *Haga*. While we fail to see how *Haga* provides decisive authority for appellants' claim, we feel compelled to note that the *Haga* decision provides an adequate

---

19. Furthermore, we discern no prejudice flowing to defendants from the misstatement. The error occurred at the voir dire stage of the proceedings, the district court acknowledged its misstatement, and the petit jury was properly instructed on the law.

20. The grand jury indicted Haga and one of the pharmacists for "conspiring to commit offenses against the United States, to wit, violations of ... Title 21, United States Code, Sections 301–392" in violation of 18 U.S.C. § 371.

springboard for our discussion of section 371. In *Haga*, the Court noted that the Supreme Court, in circumscribing the reach of the predecessor to section 371, explained some of the boundaries of the "conspiracy to defraud" statute.

> To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

*Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924).

■ This Court, in *Haga*, noted that a typical section 371 "conspiracy to defraud" indictment includes language indicating that the fraud was perpetrated by active interference with some specific function in a specified manner. Here, the indictment charged appellants with conspiring to defraud the United States and its agencies:

> including but not limited to the United States Department of Defense and Department of the Air Force, of its right to honest and faithful performance of government supply contracts, free from trickery, deceit and fraud, and by obtaining purchase orders and contracts from the United States of America by means of false and fraudulent pretenses, representations, and promises.

Within the scope of the conspiracy count, it is alleged that appellants manufactured parts for which they held no manufacturing license and that, by selling these parts to the Air Force as new, unused surplus, appellants bypassed "the inspection system established by the United States to insure the quality" of newly manufactured parts. Based on the summation set out in *Haga*,

the indictment in this case was wholly typical, and more than sufficient to charge an offense.[21]

Appellants also point to the language in *Haga* indicating that

> [w]hile it is not altogether clear whether a "conspiracy to defraud" indictment must specifically allege that the conspiracy had as its object interfering with a particular, specific governmental function, it nevertheless seems plain that, for a section 371 conspiracy to stand, the essence of the conspiracy must at least involve a showing of more than inadvertent contact with a governmental agency or incidental infringement of governmental regulations.

*Id.* at 1041.

Appellants, relying on this portion of *Haga*, assert that the evidence at trial indicates that any fraud on the United States which occurred was wholly incidental to the clandestine manufacturing of unlicensed aircraft parts, and, consequently, cannot support a conviction under section 371. In support of this assertion, appellants point to *United States v. Dennis*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). This Court, in *Haga*, pointed to *Dennis* to support the conclusion that a charge of conspiracy to defraud must reflect "the essence of the alleged offense." *Haga*, 821 F.2d at 1041. In *Dennis*, the defendants alleged that because the National Labor Relations Board had to accept certain affidavits as true, there was no intention to defraud the Government through a conspiracy to submit false affidavits. The Supreme Court rejected this argument, stating that this "allocation of responsibility relating to the sanctions attached to false affidavits does not alter the character or legal consequences of petitioners' alleged actions." *Dennis*, 384 U.S. at 862, 86 S.Ct. at 1845.

■ This Court has indicated that whatever other intent a defendant had when a crime is committed, does not alter the legal effect of his actions. Once the intent for the crime charged has been es-

**21.** *See also Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

tablished, it is immaterial that the defendant may also have had a second intent. *See, e.g., United States v. Douglass,* 476 F.2d 260, 262 (5th Cir.1973). That the evidence may in fact support a conclusion that appellants had a parallel intent to deceive Sundstrand as well as the United States does not nullify the propriety of their convictions.

■ Similar reasoning supports our conclusion that the evidence relating to unlicensed manufacturing was properly admitted. The procedure whereby the fraud was perpetrated, the representation of newly manufactured parts as new, unused surplus, is necessarily inextricably intertwined with the clandestine manufacture of those very parts. Consequently, under these facts it is nonproductive to suggest that evidence of the manufacture of unlicensed aircraft parts cannot be used as evidence of a conspiracy to defraud the United States government. One brick does not make a wall; the unlicensed manufacturing evidence is seen as one brick in a very complex wall of conspiracy. The falsity of appellants' representation that the parts were manufactured by Pesco was demonstrated by establishing that the parts did not fall within Donallco's licensing agreement. To demonstrate that the Government inspection system was bypassed, it was necessary to show that the parts were counterfeited under a false record system, indicating an attempt to disguise their source and thereby confuse government quality control examiners. Knowledge and intent of the appellants was demonstrated by establishing the record system that had been set up within the company. All of these "bricks" were deemed necessary to form a picture for the jury of the method and means by which the appellants conspired to defraud the Government.

Appellants further contend that the district court erred by refusing to take protective measures to insure that the jury understood the distinction between the manufacture of unlicensed aircraft parts and a conspiracy to defraud the United States. Specifically, appellants argue that they were prejudiced by the district court's refusal to submit appellants' profferred instruction which reads as follows:

> [Y]ou must consider that a defendant does not necessarily agree to further this illegal object [of the conspiracy charged in Count One] merely because he aids or assists in manufacturing or marketing parts sold by Donallco to the government, even if the defendant believed that Donallco was not licensed by the Sundstrand Corporation to manufacture those parts. Thus, if you find that actions were taken by a defendant that involved an intent to mislead the Sundstrand Corporation, then you are instructed that this is not evidence of an intent to mislead, deceive, or defraud the government.

Record Vol. 2 at 501–02.

■ A district judge has broad discretion in formulating the charge so long as the charge accurately reflects the law and the facts of the case. *United States v. Harrelson,* 705 F.2d 733, 736 (5th Cir.1983). This Court shoulders the responsibility of determining whether the trial court's charge, taken as a whole, is adequate when considered in the full context of the trial. *United States v. Chavis,* 772 F.2d 100, 108 (5th Cir.1985). Furthermore, a district court may properly decline to give a requested instruction "which incorrectly states the law, is without foundation in the evidence, or is stated elsewhere in the instructions." *United States v. Robinson,* 700 F.2d 205, 211 (5th Cir.1983).

■ Here, the requested instruction was not an instruction on a defensive theory which, had the jury believed appellants' version of the facts, would have entitled appellants to an acquittal. *See, e.g., United States v. Rubio,* 834 F.2d 442 (5th Cir. 1987). Rather, the instruction simply emphasized appellants' contention that they could not be convicted merely for aiding and assisting in manufacturing unlicensed parts with the intent to mislead Sundstrand.

The district court's charge was an adequate statement of the law, and the refusal to give the requested instruction was not error. Rather, the trial court specifically instructed the jury on the essential ele-

ments of the crime of conspiracy, that mere presence or similarity of conduct does not establish membership, that the indictment charged a conspiracy to defraud the Government, that each appellant could be convicted only if he "knew that some co-conspirators sought to defraud the Government and that with knowledge of this unlawful purpose the Defendant wilfully agreed to join a co-conspirator's scheme to defraud the Government," on the definition of "intent to defraud," that good faith was a defense, that each defendant's guilt was to be considered separately, and that the defendants were not on trial for any act not alleged in the indictment. The trial court's instruction did not misstate the law in this case. Had the jury believed the intention was to defraud Sundstrand rather than the United States, it would have been compelled to render a verdict of acquittal. No error was committed by refusing to give the proffered instruction.

In sum, the indictment properly charged an offense, evidence pertaining to that offense was properly admitted, and the court's charge relating to Count One was not in error.

### B. Denial of a Fair and Impartial Trial

Appellants argue that the trial of the case in the Western District of Texas resulted in a denial of the defendants' right to a fair and impartial jury. The actual trial took place in the San Antonio area. Kelly Air Force Base is a primary employer of persons in the central Texas area. Appellants, fearing "public antipathy towards and mind-set against defense contractors, particularly in a military town," [22] requested during voir dire that all Kelly personnel, as well as close family members, be excused for cause. An identical request was made with respect to other military bases in the area and Department of Defense employees. The district court denied the request.

Appellants urge that the district court's refusal to strike such individuals, resulting in the necessary utilization of peremptory challenges on such persons and the acceptance of jurors which would otherwise have been struck, culminated in denying appellants their right to a trial by a fair and impartial jury. The Constitution guarantees the right to an impartial jury which will render a verdict based solely on the evidence presented in court. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 2d 751 (1961); *United States v. Apodaca*, 666 F.2d 89 (5th Cir.), *cert. denied*, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 58 (1982). Appellants have not established a violation of this right.

A trial court has broad discretion in conducting a voir dire and assessing any prejudice held by a potential juror. *Apodaca*, 666 F.2d at 94. The district court did not abuse its discretion by denying appellants' motion to strike military base employees and their families for cause. Employment by the United States, without more, does not constitute sufficient grounds for a challenge for cause. Appellants seem to be suggesting that, in this case, more than mere employment by the Government is implicated by the disdain and hostility with which military personnel view defense contractors.[23] However, any bias or prejudice arising from this attitude (if one did, in fact, exist) was adequately explored by the district court.

During voir dire, the members of the venire were closely questioned regarding any ties to Kelly. Only five veniremen were actually employed by Kelly, and none of these worked in the contracting field. Three of the five were excused. Three members of the panel were retired from Kelly, and one from Lackland Air Force Base. Of the four veniremen with family members employed by Kelly, three were excused. Finally, one venireman's wife was retired from Fort Sam. All of the veniremen who were not excused indicated during individual questioning that they were able to be fair and impartial. Following the completion of individual questioning, the court again inquired whether anyone with relatives connected to military

---

22. Appellants' Brief at 43–44.

23. Appellants' Brief at 48.

establishments would be influenced by the relationship. When the court's interrogation suggested that a juror held a bias, the juror was excused from service. No abuse of the district court's discretion has been indicated. The court's examination was both adequate and sufficiently thorough to reveal any latent prejudice.[24]

 In a more specific line of attack, appellants contend that the court's refusal to excuse juror Augustus Rojas constituted an abuse of discretion. After trial commenced, it became known that Rojas had a social acquaintance with an agent of OSI, the investigatory agency which was present throughout the trial. An in camera hearing was held, after which the district court determined that there was no need to excuse Rojas. This decision did not constitute an abuse of discretion in light of the evidence revealed at the in camera hearing. The hearing established that the children of the two men skated together six nights a week, that the two men had no allegiance to one another, and that Rojas did not even know the agent's last name. Furthermore, the men decided that they would not socialize with each other during the course of the trial. The trial court has discretion to determine if an out of court contact or communication relates to a matter pending before the court and whether the defendant was prejudiced by it. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The court properly conducted an investigation which indicated nothing more prejudicial than a social contact with an investigatory agent based on a children's skating club. Based on the record before us, we fail to see how the district court can be said to have abused its discretion.

## C. Posse Comitatus Act Violations

Air Force Major Pete Held is a commissioned officer in the Judge Advocate Corp. In 1984, while still serving in this capacity, Major Held took the oath to become a special assistant to the United States Attorney. This dual role continued throughout the course of the Donallco proceeding, with Major Held participating in the investigation, presentation to the grand jury, and prosecution of this case.

 Appellants contend that the district court erred in refusing to dismiss the indictment due to Major Held's presence before the grand jury in violation of Fed.R. Crim.P. 6(d). Appellants argue that Major Held's participation violated the Posse Comitatus Act.[25] Consequently, the argument continues that Major Held's presence before the grand jury constituted a violation of Rule 6(d) necessitating dismissal of the indictment. For these same reasons, appellants argue that the district court erred in refusing to exclude Major Held from the proceedings altogether. We cannot agree.

 The Posse Comitatus Act provides that whoever "willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall" commit an offense. 18 U.S.C. § 1385. Appellants would have this Court hold that Major Held's "hybrid position constitutes the very merger of the civil laws and military authority that the Posse Comitatus Act prohibits." Appellants' Brief at 99–100. The legislative and judicial history of the Act, however, indicates that its purpose springs from an attempt to end the use of federal troops to police state elections in ex-Confederate states. *United States v. Hartley*, 486 F.Supp. 1348 (D.C. Fla.1980). In keeping sight of this original purpose, the Eighth Circuit has indicated

24. In fact, the voir dire uncovered a prejudice in a venireman against counsel for a defendant. The juror was excused. Appellants, however, point to one prospective juror's pronouncement that she could not fairly serve, after having previously indicated her impartiality, as evidence that the court's examination was not thorough enough. One juror, however, is not an indictation of widespread prejudice, particularly

in light of the court's individual questioning in this area.

25. Appellants also assert that Major Held's presence violated the Dual Compensation Statute, 10 U.S.C. § 973(b). Because appellants have failed to adequately brief this point, we do not address it. *See, e.g., Morrison v. City of Baton Rouge*, 761 F.2d 242 (5th Cir.1985).

that military involvement does not constitute a violation of the Act "unless it actually regulates, forbids, or compels some conduct on the part of those claiming relief." *Bissonette v. Haig*, 776 F.2d 1384, 1390 (8th Cir.1985), *adhered to on rehearing*, 788 F.2d 494 (1986) (en banc), *cert. granted*, 479 U.S. 1083, 107 S.Ct. 1283, 94 L.Ed.2d 141 (1987); *United States v. McArthur*, 419 F.Supp. 186, 194 (D.N.D.), *aff'd sub nom. United States v. Casper*, 541 F.2d 1275 (8th Cir.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977).

■ It is not, however, necessary for this Court to determine whether the rule set out in *Bissonette* or some other form of guideline should be applicable to cases brought under the Posse Comitatus Act in this Circuit. Rather, we note that appellants have failed to recognize that the Act expressly provides an exception in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." Congress, by authorizing the appointment of Special Assistant United States Attorneys and Assistant United States Attorneys to assist the Attorney General, has authorized Major Held's appointment. 28 U.S.C. §§ 515, 543. This authorization contains no limitation on the persons whom the Attorney General may appoint, nor does it indicate any limitations on the duties which the appointee may perform. Instead, section 515 indicates that the appointed attorney may "conduct any kind of legal proceedings, civil or criminal, including grand jury proceedings." As this Court has indicated, this statute exists as an indication of authority, not as a limitation. *United States v. Sklaroff*, 552 F.2d 1156, 1161 (5th Cir.1977), *cert. denied sub nom. Leppo v. United States*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978).

In addition to the congressional authorization of Major Held's position embedded in the Attorney General's appointment power, authority for Major Held's service is also found in the National Defense Authorization Act, which provides that

> A judge advocate who is assigned or detailed to perform the functions of a civil office in the Government ... may perform such duties as may be requested by the agency concerned, including representation of the United States in civil and criminal cases.

10 U.S.C. § 806(d)(1). Considering the Posse Comitatus Act's own indication that it should be interpreted in light of the co-existing statutory framework, it seems clear that Major Held's participation in no way violates the Act's provisions.[26]

D. Sufficiency of the Evidence

■ We have reviewed the remainder of the grounds raised by all five appellants and find no reversible error. Consequently, we turn now to the grounds raised solely by appellants Hansen and Milhous. Hansen and Milhous contend that the evidence was insufficient to sustain the convictions under Count One. When reviewing a claim of insufficient evidence, this Court examines the admissible evidence to determine whether, when viewed in the light most favorable to the jury verdict and accepting all credibility choices which tend to support that verdict, there was sufficient evidence upon which a reasonable trier of fact could find a defendant guilty beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547 (5th Cir.1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). We have examined the record in this case, and determine that there is sufficient evidence of Milhous and Hansen's status as co-conspirators to support their convictions.

■ In order to support a charge of conspiracy to defraud the United States, it is incumbent on the Government to prove the following: (1) the existence of an agreement, (2) that the defendants, having knowledge of that agreement, voluntarily joined the conspiracy, and (3) that an overt act was committed in furtherance of the

---

**26.** Having determined that no violation of the Act occurred, we do not address the appropriate remedy for violations of the Act.

conspiracy. *United States v. Wheeler*, 802 F.2d 778 (5th Cir.1986), *cert. denied sub nom. Strauder v. United States*, 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987). Although the Government must prove knowledge of and intent to join the conspiracy, it is not necessary to prove that the defendant knew all the details of the conspiracy. *United States v. Bland*, 653 F.2d 989 (5th Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981).

 In the instant case, the evidence indicated that both men helped to make the determination as to whether Donallco had sufficient expertise to manufacture the counterfeit parts. Two employees of the company testified that they had conversations with the men which indicated their participation in the scheme. Additionally, the evidence indicates that both men were present at a conference where concern was expressed over a pending inspection by the Air Force during which the clandestine manufacturing scheme might be discovered. Hansen, at times, issued instructions for certain parts to be removed from the manufacturing floor and hidden when visitors were on the premises. Milhous was in charge of the machine shop and initially obtained the conversion numbers in 1973. His signature appears throughout the production records on blueprints, blueprint changes, and production records. Along with Hansen, Milhous sat on the quality review board, and made the determination as to whether parts, including those at issue here, were of a quality to be routed to the Government.

 In finding the existence of a conspiracy, the jury may consider presence or association, *United States v. Natel*, 812 F.2d 937 (5th Cir.1987), as well as the development and collocation of circumstances. *United States v. Malatesta*, 590 F.2d 1379 (5th Cir.) (en banc), *cert. denied sub nom. Bertolotti v. United States*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). In the instant case, there was sufficient evidence, applying the above standards, to uphold the jury's determination that Milhous and Hansen were co-conspirators in a conspiracy to defraud the Government by proffering newly manufactured equipment as new, unused surplus which had been manufactured pursuant to the MIL–I standard.

### III. CONCLUSION

The facts in this case unfold to reveal a complex and remarkable scheme to covertly manufacture aircraft parts for distribution as new, unused surplus. The scheme worked a fraud on the United States Air Force by circumventing the inspection system designed to ensure that all newly manufactured parts meet with the approval of government quality assurance personnel. The appellants have raised numerous issues on appeal; no reversible error has been shown; the convictions are affirmed.

AFFIRMED.